OPINION
{¶ 1} Appellant, Rachel Stewart, Personally and as Administratrix of the Estate of Rhonda Kelly, appeals from the May 10, 2005 judgment entry of the Ashtabula County Court of Common Pleas, granting the joint motion for summary judgment of appellees, North Coast Center ("North Coast"), Jonathan Lee ("Lee"), Pam Dustman ("Dustman"), and Karen Woodard ("Woodard").
 {¶ 2} On December 17, 2003, appellant filed a complaint against North Coast, Dr. Kay Q. McKenzie ("Dr. McKenzie"), Dr. David Falk ("Dr. Falk"), Lee, Paul Brinkman ("Brinkman"), Darla Cunningham ("Cunningham"), Janet Fowkes ("Fowkes"), Sue Kreig ("Kreig"), Pat Harrison ("Harrison"), David Ruddler ("Ruddler"), Jackie Jaros ("Jaros"), Linda Blum ("Blum"), Terry Wrialey ("Wrialey"), Sean Allgood ("Allgood"), and Dustman, as well as a "Jane Doe" and "John Doe," alleging two causes of action pursuant to R.C. 2305.51: (1) failure to predict, warn, or take required action to protect and prevent the death of appellant's sister, Rhonda Kelly ("the decedent"), from their dangerous patient, Alexander Castellano ("Castellano"), the decedent's ex-boyfriend; and (2) negligence.[1] Appellees filed a joint answer on February 10, 2004.
 {¶ 3} Appellant filed an amended complaint, pursuant to Civ.R. 15, on September 16, 2004, against North Coast and the same foregoing individuals, with the exception of Dr. Falk, and added Dr. Michael Primc ("Dr. Primc") and Woodard.[2]
Appellees filed a joint answer on October 14, 2004.
 {¶ 4} On January 7, 2005, appellant filed a notice of dismissal, dismissing Dr. McKenzie, Cunningham, Ruddler, Blum, Wrialey, Allgood, and Dr. Falk, without prejudice. On January 11, 2005, appellant filed a second amended complaint against North Coast, Dr. Primc, Lee, Brinkman, Fowkes, Kreig, Harrison, Jaros, Dustman, and Woodard, as well as added new party defendant, North Coast Student Assistance Corporation. On February 1, 2005, appellees filed an answer. On February 4, 2005, appellant filed a notice of dismissal, dismissing Fowkes, Kreig, Brinkman, Jaros, and Harrison, without prejudice.
 {¶ 5} On February 24, 2005, appellees and Dr. Primc filed a joint motion for summary judgment pursuant to Civ.R. 56(C). Appellant filed a memorandum in opposition on March 14, 2005. Appellees and Dr. Primc filed reply briefs on March 21, 2005.
 {¶ 6} The decedent received outpatient treatment at North Coast from July 26, 2001 through April 26, 2002. She was referred to North Coast as part of a pre-sentence investigation in a criminal case for substance abuse evaluation and counseling, including counseling for relationship issues. Castellano was treated at North Coast from June 5 through June 28, 2002, for depression and anger management.
 {¶ 7} With respect to the decedent, she was initially assessed by counselor David Bowins ("Bowins"), who was supervised by Dustman. Bowins' assessment describes the decedent's long history of alcohol/substance abuse; her attempted suicide in April 2001, due to a failed relationship; her abusive relationships; and her suffering from depression and anxiety. He concluded that the decedent met the criteria for alcohol and substance dependence. Bowins recommended that she attend individual counseling sessions with Dustman, obtain a psychiatric evaluation, and begin the Intensive Outpatient Program ("IOP") at North Coast.
 {¶ 8} On August 6, 2001, the decedent met with Dustman, complaining of depression, low energy, irritability, and mood swings. Dustman referred her to a psychiatrist for evaluation. The decedent participated in the IOP from December 2001 through February 2002, which was run by Bowins and counselor Connie Ness ("Ness"). On January 4, 2002, the decedent indicated that she had moved in with her boyfriend named "Alex," but did not provide his surname. According to Ness, the decedent stated that her boyfriend was very negative, non-supportive of her treatment, and abusive. Ness and the group encouraged her to think of her well-being first. On January 31, 2002, the decedent reported that she had talked with her boyfriend and that things went well.
 {¶ 9} In February 2002, the decedent graduated to the adult aftercare chemical dependency program at North Coast, and attended several sessions with Dustman and her counselor, Melanie Phipps ("Phipps"). Phipps indicated that the decedent told her that her boyfriend did not support her. Phipps recommended that she attend more Alcoholics Anonymous meetings and look for support from positive people. At her final adult aftercare session, the decedent believed that she had achieved balance in the areas of spirituality, family, and friends.
 {¶ 10} In her individual counseling sessions with Dustman, Dustman said that the decedent continued to talk about her abusive boyfriend and reported that she was depressed. The decedent contacted North Coast in May 2002, to cancel her individual counseling sessions because she had gotten a factory job and was too tired to attend. Dustman tried to contact her but was unsuccessful. The decedent did not return to North Coast for any further sessions.
 {¶ 11} With respect to Castellano, Woodard's initial assessment on June 5, 2002, indicates that he was experiencing multiple situational problems; wanted to work with a therapist on anger management; had problems with his girlfriend, but did not provide her name; previously attended anger management classes at another facility but did not consider it helpful; denied any suicidal or homicidal thoughts; and said that he did not own or have access to any weapons.
 {¶ 12} During the initial meeting between Castellano and Dustman on June 6, 2002, Dustman stated that Castellano informed her that he felt anxious and angry at everyone in general, but did not give a specific name, was afraid he was going to "go off" on someone, and that he wanted to quit his job. According to Dustman, Castellano discussed a number of issues in his life, including the loss of custody of his son; a domestic violence charge; his break-up with his girlfriend; and his desire to move back to Pennsylvania. Dustman worked with Castellano to decrease his generalized anger. She did not believe that Castellano presented a threat of harm to himself or to others at that time.
 {¶ 13} At the second session on June 11, 2002, Dustman indicated that Castellano continued to feel angry and believed it would be better if he were dead. Castellano admitted that he tried to commit suicide in the past, but Dustman stated that he did not express any current intent. Dustman said that Castellano told her that his guns were not at his house, but rather were buried outside of Ohio. Castellano kept thinking about his girlfriend, but did not display any anger toward her. Castellano agreed to see a psychiatrist. Dustman did not think that he presented a danger to others at that time.
 {¶ 14} The following day, Dr. Primc met with Castellano and diagnosed him with depression and intermittent explosive disorder. Dr. Primc prescribed medication and recommended that Castellano continue his therapy with Dustman. According to Dr. Primc, Castellano denied any suicidal or homicidal thoughts at that time.
 {¶ 15} At Castellano's third session with Dustman on June 17, 2002, he indicated that he was extremely angry about his situation, but did not express any direct anger toward his girlfriend, who told him that she never wanted to see him again. He stated that he would be better off dead. Dustman worked with Castellano to help him decrease his depression and anger. She advised him that she was going on vacation until July and that he was to see other North Coast personnel, including Woodard.
 {¶ 16} On June 21, 2002, Castellano called Woodard to request a medical note excusing him from work because he was still feeling anger and had destroyed many belongings inside his home with a hammer. Woodard contacted Dr. Primc, who changed Castellano's medication and wrote him an excuse from work. On June 25, 2002, Castellano called Woodard to report his increased anger and frustration. Castellano told Woodard that he built a pipe bomb to blow up his car and kill himself, as well as drove one hundred miles an hour down the road. Woodard suggested hospitalization but Castellano refused. She stated that he said he had thrown the pipe bomb in Lake Erie and had no more chemicals to make another.
 {¶ 17} Woodard contacted Dr. Primc, who ordered an increased dosage of medication. She called Castellano to notify him of his new medication order, and indicated that he told her that he was going to spend some time with his landlord and pastor, Walter Duane Pinney ("Pastor Pinney") that evening. Castellano arranged to pick up the medication the following day and scheduled an appointment with Dr. Primc. On June 26, 2002, he picked up his medication. Woodard did not report any unusual behavior or comments by Castellano at that time.
 {¶ 18} Pastor Pinney thought that Castellano might have suicidal inclinations and tried to help him. Castellano did not tell Pastor Pinney or his wife, Pamela Pinney ("Mrs. Pinney"), that he had any thoughts of hurting the decedent.
 {¶ 19} On June 28, 2002, shortly after midnight, Castellano attacked the decedent on her way home from work. He shot at her vehicle and ran it off the road. Castellano then pulled the decedent into his car. Her burned body was later found inside Castellano's burned out vehicle. Castellano's body was found approximately fifty feet away. He died from an apparent self-inflicted gunshot wound.
 {¶ 20} Pursuant to its May 10, 2005 judgment entry, the trial court granted appellees' joint motion for summary judgment.[3] It is from that judgment that appellant filed a timely notice of appeal and makes the following assignments of error:
 {¶ 21} "[1.] The trial court committed prejudicial error which materially affected appellant's rights when it improperly interpreted [R.C.] 2305.51 and granted judgment for appellees.
 {¶ 22} "[2.] The trial judge committed prejudicial error and violated appellant's right to a trial by jury when the judge identified the questions of fact that were present; engaged in an analysis of fact and witness credibility and granted summary judgment based on his own personal factual conclusions.
 {¶ 23} "[3.] The trial court committed prejudicial error in granting summary judgment where appellant provided the court with sufficient evidence of the elements necessary to find the mental health providers in this case liable for failing in their specific duty to protect [the decedent] from the dangerous propensities of Castellano."
 {¶ 24} In her first assignment of error, appellant argues that the trial court erred by improperly interpreting R.C.2305.51 and granting judgment for appellees. Appellant presents three issues for review. In her first issue, appellant alleges that R.C. 2305.51 is exclusively aimed at the conduct of mental health professionals so that what is "explicit" must be what is explicit to a reasonable mental health professional. In appellant's second issue, she contends that the elimination of the reasonable mental health professional standard from the determination of what is required in R.C. 2305.51 contravenes public policy. In her third issue, appellant indicates that the trial court's analysis and factual conclusions disregard the fact that the decedent was a "knowledgeable person" under R.C.2305.51.
 {¶ 25} In order for a summary judgment to be granted, the moving party must prove:
 {¶ 26} "* * * (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." Mootispaw v. Eckstein (1996),76 Ohio St.3d 383, 385.
 {¶ 27} The Ohio Supreme Court stated in Dresher v. Burt
(1996), 75 Ohio St.3d 280, 296:
 {¶ 28} "* * * the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record whichdemonstrate the absence of a genuine issue of fact on a materialelement of the nonmoving party's claim. The `portions of the record' to which we refer are those evidentiary materials listed in Civ.R. 56(C), such as the pleadings, depositions, answers to interrogatories, etc., that have been filed in the case. * * *" (Emphasis sic.)
 {¶ 29} If the moving party satisfies this burden, then the nonmoving party has the burden, pursuant to Civ.R. 56(E), to provide evidence demonstrating a genuine issue of material fact. If the nonmoving party does not satisfy this burden, then summary judgment is appropriate. Civ.R. 56(E). Appellate courts review a trial court's granting of summary judgment de novo. Brown v.Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. TheBrown court stated that "we review the judgment independently and without deference to the trial court's determination." Id. An appellate court must evaluate the record "in a light most favorable to the nonmoving party." Link v. Leadworks Corp.
(1992), 79 Ohio App.3d 735, 741. Furthermore, a motion for summary judgment must be overruled if reasonable minds could find for the party opposing the motion. Id.
 {¶ 30} R.C. 2305.51, "Immunity of mental health professional or organization as to violent behavior by client or patient[,]" provides in part:
 {¶ 31} "(A) (1) As used in this section:
 {¶ 32} "* * *
 {¶ 33} "(b) `Mental health client or patient' means an individual who is receiving mental health services from a mental health professional or organization.
 {¶ 34} "(c) `Mental health organization' means an organization that engages one or more mental health professionals to provide mental health services to one or more mental health clients or patients.
 {¶ 35} "(d) `Mental health professional' means an individual who is licensed, certified, or registered * * * to provide mental health services for compensation, remuneration, or other personal gain.
 {¶ 36} "(e) `Mental health service' means a service provided to an individual or group of individuals involving the application of medical, psychiatric, psychological, counseling, social work, or nursing principles or procedures to either of the following:
 {¶ 37} "(i) The assessment, diagnosis, prevention, treatment, or amelioration of mental, emotional, psychiatric, psychological, or psychosocial disorders or diseases * * *;
 {¶ 38} "(ii) The assessment or improvement of mental, emotional, psychiatric, psychological, or psychosocial adjustment or functioning, regardless of whether there is a diagnosable, pre-existing disorder or disease.
 {¶ 39} (f) `Knowledgeable person' means an individual who has reason to believe that a mental health client or patient has the intent and ability to carry out an explicit threat of inflicting imminent and serious physical harm to or causing the death of a clearly identifiable potential victim or victims and who is either an immediate family member of the client or patient or an individual who otherwise personally knows the client or patient.
 {¶ 40} "* * *
 {¶ 41} "(B) A mental health professional or mental health organization may be held liable in damages in a civil action * * * for serious physical harm or death resulting from failing to predict, warn of, or take precautions to provide protection from the violent behavior of a mental health client or patient, only if the client or patient or a knowledgeable person has communicated to the professional or organization an explicit threat of inflicting imminent and serious physical harm to or causing the death of one or more clearly identifiable potential victims, the professional or organization has reason to believe that the client or patient has the intent and ability to carry out the threat, and the professional or organization fails to take one or more of the following actions in a timely manner:
 {¶ 42} "(1) Exercise any authority the professional or organization possesses to hospitalize the client or patient on an emergency basis * * *;
 {¶ 43} "(2) Exercise any authority the professional or organization possesses to have the client or patient involuntarily or voluntarily hospitalized * * *;
 {¶ 44} "(3) Establish and undertake a documented treatment plan * * *;
 {¶ 45} "(4) Communicate to a law enforcement agency * * * and if feasible, communicate to each potential victim or a potential victim's parent or guardian if the potential victim is a minor or has been adjudicated incompetent, all of the following information:
 {¶ 46} "(a) The nature of the threat;
 {¶ 47} "(b) The identity of the mental health client or patient making the threat;
 {¶ 48} "(c) The identity of each potential victim of the threat."
 {¶ 49} In the case at bar, because appellant's first and second issues are interrelated, we will address them in a consolidated manner.
 {¶ 50} We agree with appellant that R.C. 2305.51 applies to mental health professionals. However, we disagree with appellant that the trial court eliminated mental health professionals in its interpretation of the statute in determining what is "explicit." Although the trial court provided a dictionary definition of "explicit," the record shows that it considered the affidavits and deposition testimony of the mental health providers, who attested that no explicit threat of imminent harm had been communicated to them.
 {¶ 51} The trial court stated in its May 10, 2005 judgment entry:
 {¶ 52} "[t]he court finds that in this case there is no evidence of an explicit threat communicated to North Coast or any of the other defendants, by Castellano or [the decedent] or other knowledgeable person[s]. There is no evidence that Castellano identified [the decedent] as the potential target of imminent and serious physical harm or death. Therefore, the defendants are protected by the immunity extended by R.C. 2305.51 * * *."
 {¶ 53} Even appellant's expert, forensic psychologist Dr. Steven Neuhaus ("Dr. Neuhaus"), did not claim that an explicit threat of imminent and serious harm to the decedent by Castellano was communicated to North Coast as required to impose liability under R.C. 2305.51. Rather, Dr. Neuhaus indicated that harm from Castellano to the decedent was "foreseeable." Appellant herself stated that Castellano never told her that he intended to harm the decedent. Also, Pastor and Mrs. Pinney confirmed the absence of any threat to the decedent communicated to them by either Castellano or the decedent. The trial court did not err by stating that an expert opinion was not necessary to determine whether R.C. 2305.51 immunity applied. Appellant's first and second issues are without merit.
 {¶ 54} We also disagree with appellant that the trial court's analysis and factual conclusions disregard the fact that the decedent was a "knowledgeable person" under R.C. 2305.51. Again, the trial court's judgment entry shows that it considered the decedent as a "knowledgeable person." Appellant's third issue is without merit.
 {¶ 55} Appellant's first assignment of error is not well-taken.
 {¶ 56} In her second assignment of error, appellant alleges that the trial judge erred when he identified the questions of fact that were present, engaged in an analysis of fact and witness credibility, and granted summary judgment based on his own personal factual conclusions. Appellant presents two issues for review. In her first issue, appellant maintains that a genuine issue of material fact exists as to whether the facts constituted an "explicit threat" as required by R.C. 2305.51, thereby precluding the trial court from granting summary judgment. In her second issue, appellant argues that the trial judge invaded the province of the jury when he made factual conclusions that required assessment of witness credibility.
 {¶ 57} In the instant matter, as previously stated, there was no explicit threat of imminent harm to the decedent by Castellano communicated to appellees. Appellant fails to show that the serious physical harm or death resulted from appellees' failure to "`predict, warn of, or take precautions to provide protection from the violent behavior'" of Castellano. R.C. 2305.51(B);Cogswell v. Beech Brook, 11th Dist. No. 2003-G-2511,2004-Ohio-5639, at ¶ 34. Appellant's first issue is without merit.
 {¶ 58} A review of the record does not establish that the trial judge applied "his own personal knowledge" in construing R.C. 2305.51 or made improper credibility determinations adverse to appellant. Rather, the trial court employed an impartial standard in reviewing the undisputed facts. There simply were no credibility determinations at issue. The trial court properly granted summary judgment for appellees. Appellant's second issue is without merit.
 {¶ 59} Appellant's second assignment of error is not well-taken.
 {¶ 60} In her third assignment of error, appellant contends that the trial court erred in granting summary judgment in favor of appellees, because she provided sufficient evidence that appellees were liable for failing in their specific duty to protect the decedent from the dangerous propensities of Castellano. Appellant stresses that summary judgment was inappropriate since reasonable minds could conclude that there was sufficient evidence to indicate that appellees breached their duties as set forth in R.C. 2305.51.
 {¶ 61} As previously indicated, the record does not show any explicit threat of imminent harm to the decedent by Castellano communicated to appellees. As such, appellees had no statutory duty to take any action under R.C. 2305.51. The record does not establish that appellees knew that the decedent dated Castellano, since she referred to him only as "Alex." Also, there is no evidence that appellees knew that Castellano's girlfriend was in fact the decedent.
 {¶ 62} In addition, we note again that Woodard was not a named party to the original December 17, 2003 complaint, which listed North Coast, fourteen individual defendants, including Lee and Dustman, and a "Jane Doe" and "John Doe" as defendants. Appellant's September 16, 2004 amended complaint was filed against North Coast and the same fourteen individuals, with the exception of Dr. Falk, and substituted Dr. Primc, who is not a named party to the instant appeal, for "John Doe," and Woodard for "Jane Doe." The amended complaint, as to Woodard, is barred by the statute of limitations.
 {¶ 63} On September 18, 2004, Woodard was served the amended complaint along with a summons, which failed to contain the words "name unknown," by certified mail, rather than personal service. Woodard raised the improper service of process and the statute of limitations as affirmative defenses in her October 14, 2004 answer. Although the trial court did not reach this issue given its finding that all appellees were immune from liability under R.C. 2305.51, we note that because the requirements of Civ.R. 15(D) were not met, Civ.R. 15(C) did not cause the amended complaint to relate back to the original filing date. Mears v.Mihalega (Dec. 19, 1997), 11th Dist. No. 97-T0-040, 1997 Ohio App. LEXIS 5739, at 3, citing Amerine v. Haughton Elevator Co.
(1989), 42 Ohio St.3d 57, syllabus. Since the two-year statute of limitations expired on June 28, 2004, the amended complaint, filed on September 16, 2004, is accordingly time-barred as to Woodard.
 {¶ 64} The trial court properly granted appellees' motion for summary judgment. Appellant's third assignment of error is without merit.
 {¶ 65} For the foregoing reasons, appellant's assignments of error are not well-taken. The judgment of the Ashtabula County Court of Common Pleas is affirmed.
Rice, J., O'Toole, J., concur.
[1] North Coast is an outpatient mental health/chemical dependency treatment facility. The individuals listed are mental health professionals employed by North Coast. Lee, a certified chemical dependency counselor, founded North Coast in 1993, and is the executive director. Dustman is an Ohio licensed independent counselor/independent chemical dependency supervisor and began working at North Coast in March 2001. Woodard, who is not named in the December 17, 2003 complaint, is a registered nurse with extensive mental health experience and began working at North Coast in April 2002. Dr. McKenzie, Dr. Falk, Brinkman, Cunningham, Fowkes, Kreig, Harrison, Ruddler, Jaros, Blum, Wrialey, and Allgood, are not named parties to the instant appeal.
[2] Dr. Primc, an Ohio licensed psychiatrist, began working at North Coast in May 2002. He is not a named party to the instant appeal.
[3] On November 4, 2005, appellant filed a motion to dismiss Dr. Primc, which was granted by this court on November 29, 2005.