[Cite as *Stewart v. Solutions Community Counseling & Recovery Ctrs., Inc.*, 2021-Ohio-2635.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| BONITA STEWART, | : | |
| Appellee, | : | CASE NO. CA2021-01-008 |
| | : | O P I N I O N |
| - vs - | | 8/2/2021 |
| | : | |
| SOLUTIONS COMMUNITY COUNSELING AND RECOVERY CENTERS, INC., et al., | : | |
| | : | |
| Appellants. | | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 19CV092967

Rittgers & Rittgers, and Konrad Kircher and Ryan J. McGraw, for appellee.

Reminger Co., LPA, and Robert W. Hojnoski and Jennifer J. Jandes, for appellants.


**HENDRICKSON, J.**

{¶ 1} Appellant, Solutions Community Counseling and Recovery Centers, Inc. ("Solutions"), as well as its employee, Jenny Epling, appeal the Warren County Court of Common Pleas decision denying their motion to dismiss pursuant to Civ.R. 12(B)(6).[1] For the reasons detailed below, we affirm the trial court's decision.

---

1. We will refer to Solutions and Epling in the singular.

{¶ 2} According to the complaint, on August 30, 2016, Bonita Stewart's adult son, Justin, died by suicide while an inmate at the Warren County Jail. At the time of Justin's death, Solutions was under contract with the Warren County Commissioners to provide mental health treatment to inmates. Jenny Epling is a licensed professional mental health counselor and former Solutions employee.

{¶ 3} Bonita sued Solutions and Epling in the United Stated District Court for the Southern District of Ohio for constitutional violations pursuant to 42 U.S.C. 1983, as well as claims for wrongful death, negligence, and malpractice.[2] Following discovery, the Southern District granted summary judgment dismissing Bonita's 42 U.S.C. 1983 claims but declined to exercise jurisdiction over her state law claims. Bonita appealed to the Sixth Circuit Court of Appeals, which affirmed the Southern District's decision granting summary judgment. *Stewart v. Warren Cty. Bd. of Commrs.*, 821 F.Appx. 564, 566 (6th Cir. 2020).

{¶ 4} The instant action was filed while the case was pending in the Sixth Circuit and consists of the refiling of Bonita's state law claims for wrongful death, negligence, and malpractice. The complaint alleged that Justin had been sentenced to three years of community control and was required to undergo anger management and mental health treatment. Justin failed to comply with his mental health treatment and was arrested on April 19, 2016. While in jail, Justin refused to be medically screened and was sent to Summit Behavioral Health. While at Summit, Justin was diagnosed with narcissistic personality disorder.

{¶ 5} Upon receipt of the report from Summit, the trial court ordered a forensic evaluation by Dr. Kara Marciani. Following an evaluation, Dr. Marciani concluded that Justin suffered from "serious and chronic mental illness, [was] mentally ill, and need[ed] to

---

2. Another former Solutions employee was also named in the federal lawsuit but has since been dismissed in the instant state action.

undergo a period of hospital-based treatment." Specifically, Dr. Marciani diagnosed Justin with Delusional Disorder, Persecutory Type because he exhibited "delusions for more than one month involving beliefs that he [was] being conspired against, spied on, maliciously maligned, harassed, or obstructed in the pursuit of long term [sic] goals" and concluded that he posed a threat. The complaint alleged that Solutions and its employees had access to Dr. Marciani's report but did not review it in its entirety during their treatment of Justin at the jail.

{¶ 6} The complaint further alleged that Justin displayed bizarre and troubling behavior, including screaming in his cell, refusing most recreation time, refusing meals, and making what jail officials concluded were false medical reports. Jail staff documented these behaviors, but the complaint alleges that Solutions and its employees failed to review the claims. On August 8, 2016, Justin was found guilty of violating his probation. Four days later, Justin was moved to administrative segregation because staff deemed him unsafe in the general population.

{¶ 7} For inmates in administrative segregation, the complaint states that the jail's policy requires daily interaction. From August 15, 2016, until his death on August 30, 2016, Solutions and its employees allegedly only visited Justin on a single occasion. During this occasion, Epling approached Justin's cell and asked if he had any mental health needs. According to Epling, Justin said "no" and her interaction concluded with him, consistent with the training she received from her supervisor. The complaint states that Epling had not reviewed any medical or jail records about Justin. Throughout the period, Justin experienced hopelessness and decompensation until he died by suicide.

{¶ 8} After being served with the complaint, Solutions promptly filed a motion to dismiss pursuant to Civ.R. 12(B)(6) on the basis that it is statutorily immune from liability under R.C. 2305.51. As a result, Solutions argued that Bonita's state law claims must fail

and be dismissed with prejudice as a matter of law.

{¶ 9} On December 30, 2020, following briefing, the trial court issued a decision overruling Solutions' motion to dismiss and denying immunity under R.C. 2305.51. In a separate entry, the trial court determined that the December 30, 2020 decision was a final appealable order and there was no just reason for delay for purposes of Civ.R. 54. Solutions timely appealed, raising a single assignment of error for review:

{¶ 10} THE TRIAL COURT ERRED BY DENYING DEFENDANTS STATUTORY IMMUNITY UNDER R.C 2305.51.

{¶ 11} In its sole assignment of error, Solutions argues the trial court erred by finding that it was not entitled to statutory immunity pursuant to R.C. 2305.51. We find Solutions' argument is without merit.

{¶ 12} A Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the sufficiency of the complaint. *Klan v. Med. Radiologists, Inc.*, 12th Dist. Warren No. CA2014-01-007, 2014-Ohio-2344, ¶ 12. "[W]hen a party files a motion to dismiss for failure to state a claim, all the factual allegations of the complaint must be taken as true and all reasonable inferences must be drawn in favor of the nonmoving party." *Tankersley v. Ohio Fair Plan Underwriting Assn.*, 12th Dist. Clermont No. CA2018-01-003, 2018-Ohio-4386, ¶ 20. For a trial court to dismiss a complaint under Civ.R. 12(B)(6), it must appear beyond a reasonable doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery. *LeRoy v. Allen, Yurasek & Merklin*, 114 Ohio St.3d 323, 2007-Ohio-3608, ¶ 14. The court may look only to the complaint to determine whether the allegations are legally sufficient to state a claim. *Klan* at ¶ 12. A reviewing court conducts a de novo review of a trial court's decision on a motion to dismiss. *Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, ¶ 5.

{¶ 13} "To maintain a wrongful death action on a theory of negligence, a plaintiff must

show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." *Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation & Dev. Disabilities*, 102 Ohio St.3d 230, 2004-Ohio-2629, citing *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92 (1988).

{¶ 14} Solutions presents a novel argument that R.C. 2305.51 operates to shield them from any liability stemming from Justin's death by suicide.[3] That statute provides immunity to mental health professionals and organizations with respect to the violent behavior of a mental health client or patient, absent special circumstances. In pertinent part:

> A *mental health professional or mental health organization may be held liable in damages in a civil action * * * for* serious physical harm or death resulting from failing to predict, warn of, or take precautions to provide protection from the violent behavior of a mental health client or patient, *only if* the client or patient or a knowledgeable person has communicated to the professional or organization an explicit threat of inflicting imminent and serious physical harm to or causing the death of one or more clearly identifiable potential victims, the professional or organization has reason to believe that the client or patient has the intent and ability to carry out the threat, and the professional or organization fails to take one or more of the following actions in a timely manner: * * *

(Emphasis added.) R.C. 2305.51(B). The statute then provides four actions the mental health professional or organization may take in response to such a threat. R.C. 2305.51(B)(1)-(4).

{¶ 15} According to its reading of the statute, Solutions alleges that "R.C. 2305.51

---

3. Solutions acknowledges that "appellate courts interpreting R.C. 2305.51 have primarily dealt with claims brought against mental health professionals by injured third parties or their estates," but argues that *Johnson v. Patel*, 5th Dist. Tuscarawas No. 2006 AP 10 0058, 2008-Ohio-596, "suggests the immunity afforded to mental health providers applied when a patient commits self-harm." However, that case was decided based upon application of R.C. 5122.34 and involved a grant of summary judgment, as opposed to a dismissal under Civ.R. 12. *Id.* at ¶ 26. Furthermore, summary judgment was granted in that case not based on broad immunity held by the provider, but because there was no genuine issue of fact concerning whether the doctors acted in good faith. *Id.* at ¶ 48.

provides absolute immunity to mental health professionals and organizations with respect to the violent behavior of a mental health client or patient absent exceptional circumstances." Solutions goes on to assert that "[w]hen a mental health *patient* or *client* commits suicide, that person becomes a suicide *victim*." (Emphasis in original). It further contends that the unambiguous statutory language supports this position and there is no case law that suggests that, for purposes of R.C. 2305.51, a patient cannot also be the victim.

{¶ 16} Before turning to the specific circumstances of this case, it is useful to consider the case law and legislative enactment that give rise to Solutions' argument. First, it is well established that, ordinarily, there is no duty to control the conduct of another person to prevent that individual from causing harm to another. *Gelbman v. Second Natl. Bank of Warren*, 9 Ohio St. 3d 77, 79 (1984). One exception to this rule, however, is when a "special relation" exists such as "when one takes charge of a person whom he knows or should know is likely to cause bodily harm to others if not controlled." *Littleton*, 39 Ohio St.3d at 92.

{¶ 17} In *Littleton*, the supreme court determined that, under certain circumstances, a psychiatrist can be held liable for the violent acts of a voluntarily hospitalized patient following the patient's release from the hospital. *Id.* at syllabus. That case involved a parent, Theresa Pearson, who exhibited signs of severe depression shortly after giving birth to her second child, Carly. *Id.* at 87. Theresa experienced feelings of rejections toward Carly and expressed impulses of harming her. *Id.* Theresa was hospitalized twice and, during her second hospitalization, made an explicit threat to a nurse about her plan to inject Carly with something to kill her. *Id.* Prior to her discharge, there was a family meeting where it was agreed that Carly would be primarily cared for by her grandparents and that Theresa was not to be left alone with her for long periods of time. *Id.* 88-89. Despite the

prior threat, the family was not told of Theresa's specific threat to kill Carly. *Id.* After her discharge, Theresa did have contact with Carly but only in the presence of others. *Id.* at 90. However, approximately 14 days after her discharge, Theresa was asked to watch Carly for a short period of time. *Id.* While alone with Carly, Theresa administered a lethal dose of medication to Carly, killing her. *Id.*

{¶ 18} In its decision, the supreme court determined that a "special relation" existed, and the psychologist had a duty to take reasonable precautions to protect Carly from the patient exhibiting violent propensities. *Id.* at 92. Otherwise, there would be no legal claim for negligence because there would not be a duty owed. In so doing, the court adopted a standard of care for mental health practitioners that included a subjective element, referred to as the "professional judgment rule." *Id.* at 97. In adopting this standard of care, the court stated:

> Though a psychiatrist's ability to predict violent behavior is probably better than a layperson's, and there does appear to be some consensus within the mental health community on the factors relevant to a diagnosis of violent propensities, diagnosing both the existence of violent propensities and their severity is still a highly subjective undertaking. Psychiatric evaluations of any given fact pattern are bound to vary widely. And once a determination is made that a patient possesses a propensity for violent behavior, deciding upon a course of treatment poses difficult questions. The patient's right to good medical care, including freedom from unnecessary confinement and unwarranted breaches of confidentiality, must be balanced against the need to protect potential victims. Courts, with the benefit of hindsight, should not be allowed to second-guess a psychiatrist's professional judgment.

*Id.* 97-98.

{¶ 19} As a result, the supreme court adopted the following holding that a psychiatrist will not be held liable for the violent acts of a voluntarily hospitalized mental health patient subsequent to the patient's discharge if:

(1) the patient did not manifest violent propensities while being

hospitalized and there was no reason to suspect the patient would become violent after discharge, or (2) a thorough evaluation of the patient's propensity for violence was conducted, taking into account all relevant factors, and a good faith decision was made by the psychiatrist that the patient had no violent propensity, or (3) the patient was diagnosed as having violent propensities and, after a thorough evaluation of the severity of the propensities and a balancing of the patient's interests and the interests of potential victims, a treatment plan was formulated in good faith which included discharge of the patient.

*Id.* at 99.

{¶ 20} The supreme court expanded the duty of psychotherapists to protect third parties from the violent propensities of their outpatients in *Estate of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284. In so doing, the supreme court issued a four-part syllabus:

1. Generally, a defendant has no duty to control the violent conduct of a third person as to prevent that person from causing physical harm to another unless a "special relation" exists between the defendant and the third person or between the defendant and the other. In order for a special relation to exist between the defendant and the third person, the defendant must have the ability to control the third person's conduct.

2. R.C. 5122.34 does not preclude the finding that a special relation exists between the psychotherapist and the outpatient which imposes a common-law duty on the therapist to take affirmative steps to control the patient's violent conduct.

3. The relationship between the psychotherapist and the patient in the outpatient setting constitutes a special relation justifying the imposition of a duty upon the psychotherapist to protect against and/or control the patient's violent propensities.

4. When a psychotherapist knows or should know that his or her outpatient represents a substantial risk of harm to others, the therapist is under a duty to exercise his or her best professional judgment to prevent such harm from occurring.

*Id.* at syllabus.

{¶ 21} Although a psychotherapist has less control in an outpatient setting, the

- 8 -

supreme court determined that the psychotherapist/outpatient relationship embodied sufficient elements of control to warrant a corresponding duty with the ability to control. *Id.* at 299. The court offered several measures that a psychotherapist could employ, such as the use of medication, family intervention, and the threat of involuntary commitment to prevent an outpatient's violent propensities. *Id.* at 300.

{¶ 22} Following the supreme court's decision in *Estate of Morgan*, the General Assembly enacted new legislation, the statute at issue in this case, R.C. 2305.51, which specifically superseded that decision.

> SECTION 3. In amending section 5122.34 and in enacting section 2305.51 of the Revised Code, it is the intent of the General Assembly to respectfully disagree with and supersede the statutory construction holdings of the Ohio Supreme Court relative to section 5122.34 of the Revised Code as set forth in *Estate of Morgan v. Fairfield Family Counseling Center*, 77 Ohio St.3d 284, under heading G of Section I at 304-305, and, thereby to supersede the second, third, and fourth syllabus paragraph holdings of the Court in that case.

1999 Ohio H.B. 71, Section 3. Notably, the General Assembly did not express any intention to supersede the first paragraph of the syllabus, which, again, states:

> 1. Generally, a defendant has no duty to control the violent conduct of a *third person* as to prevent that person from causing physical harm to another unless a "special relation" exists between the defendant and the *third person* or between the defendant and the other. In order for a special relation to exist between the defendant and the *third person*, the defendant must have the ability to control the third person's conduct.

(Emphasis added.)

{¶ 23} The supreme court has construed this statute only one time. *Campbell v. Ohio State Univ. Med. Ctr.*, 108 Ohio St.3d 376, 2006-Ohio-1192. In *Campbell*, a patient of a mental health institution physically attacked and injured another patient in the hospital. *Id.* at ¶ 2. The victim filed a complaint in the Court of Claims, alleging that the medical center violated R.C. 5122.29 (B)(2) by failing to provide her with reasonable protection from

the violent conduct of others. *Id.* The supreme court considered the victim's complaint in light of R.C. 2305.51 and held that "[w]hen a patient of a mental-health institution is assaulted or battered by another patient, the institution may be held liable for harm that results only if the patient establishes liability under R.C. 2305.51." *Id.* at syllabus. Since there was no evidence that an explicit threat of an attack was communicated to the hospital, the supreme court found that summary judgment was properly granted in favor of the medical center. *Id.* at ¶ 16. In so doing, the supreme court specifically noted that the "General Assembly has made R.C. 2305.51 the exclusive means by which a mental-health patient may establish liability for harm caused by *another patient*." (Emphasis added.) *Id.* at ¶ 19.

{¶ 24} Similar cases construing R.C. 2305.51 have likewise involved actions by third parties for harm caused by a mental health patient. *See Stewart v. N. Coast Ctr.*, 11th Dist. Ashtabula No. 2005-A-0042, 2006-Ohio-2392, ¶ 57 (since no explicit threat of imminent harm was made to the mental healthcare provider, the victim of assault by a patient was precluded from filing suit); *Cogswell v. Brook*, 11th Dist. Geauga No. 2003-G-2511, 2004-Ohio-5639, ¶ 34 (mental health organization immune from liability where there was no evidence that organization had any reason to believe its patient had the intent and ability to carry out the violence inflicted on the third parties).

{¶ 25} Thus, according to the legislative history, applicable case law from the supreme court, as well as cases from our sister district, we understand that R.C. 2305.51 is a legislative response to the "special relation" duty to third parties as discussed in *Littleton*. With that background in mind, we now turn to the specific issue raised by Solutions, i.e., whether R.C. 2305.51 affords immunity to mental health providers when a client or patient dies by suicide.

{¶ 26} In construing a statute, the primary goal "is to ascertain and give effect to the

intent of the legislature as expressed in the statute." *Stewart v. Vivian*, 12th Dist. Clermont No. CA2015-05-039, 2016-Ohio-2892, ¶ 44. A basic rule of statutory construction is that the words and phrases must be read in context and interpreted as a whole, giving effect to all the words in the statute. *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172 ¶ 19.

{¶ 27} In this case, R.C. 2305.51 provides, in pertinent part:

(B) A *mental health professional or mental health organization may be held liable in damages in a civil action * * ** for serious physical harm or death resulting from failing to predict, warn of, or take precautions to provide protection from the violent behavior of a mental health client or patient, *only if* the client or patient or a knowledgeable person has communicated to the professional or organization an explicit threat of inflicting imminent and serious physical harm to or causing the death of one or more clearly identifiable potential victims, the professional or organization has reason to believe that the client or patient has the intent and ability to carry out the threat, and the professional or organization fails to take one or more of the following actions in a timely manner:

(1) Exercise any authority the professional or organization possesses to hospitalize the client or patient on an emergency basis pursuant to section 5122.10 of the Revised Code;

(2) Exercise any authority the professional or organization possesses to have the client or patient involuntarily or voluntarily hospitalized under Chapter 5122. of the Revised Code;

(3) Establish and undertake a documented treatment plan that is reasonably calculated, according to appropriate standards of professional practice, to eliminate the possibility that the client or patient will carry out the threat, and, concurrent with establishing and undertaking the treatment plan, initiate arrangements for a second opinion risk assessment through a management consultation about the treatment plan with, in the case of a mental health organization, the clinical director of the organization, or, in the case of a mental health professional who is not acting as part of a mental health organization, any mental health professional who is licensed to engage in independent practice;

(4) Communicate to a law enforcement agency with jurisdiction in the area where each potential victim resides, where a

- 11 -

structure threatened by a mental health client or patient is located, or where the mental health client or patient resides, and if feasible, communicate to each potential victim or a potential victim's parent or guardian if the potential victim is a minor or has been adjudicated incompetent, all of the following information:

(a) The nature of the threat;

(b) The identity of the mental health client or patient making the threat;

(c) The identity of each potential victim of the threat.

* * *

(C) All of the following apply when a mental health professional or organization takes one or more of the actions set forth in divisions (B)(1) to (4) of this section:

* * *

(3) The mental health professional or organization is not required to take an action that, in the exercise of reasonable professional judgment, would physically endanger the professional or organization, increase the danger to a potential victim, or increase the danger to the mental health client or patient.

(Emphasis added.) R.C. 2305.51(B)-(C). The statute defines "mental health client or patient" as "an individual who is receiving mental health services from a mental health professional or organization." R.C. 2305.51(A)(1)(b). Likewise, a "knowledgeable person" is defined as:

an individual who has reason to believe that a mental health client or patient has the intent and ability to carry out an explicit threat of inflicting imminent and serious physical harm to or causing the death of a clearly identifiable potential victim or victims and who is either an immediate family member of the client or patient or an individual who otherwise personally knows the client or patient.

R.C. 2305.51(A)(1)(f).

{¶ 28} Following review, we conclude that R.C. 2305.51 does not provide for the

immunity that Solutions argues for on appeal – i.e., broad immunity from liability in the event its client or patient dies by suicide. Rather, R.C. 2305.51 provides immunity to mental health professionals and mental health organizations when their client or patient causes physical harm or death to third parties. To hold otherwise would send a conflicting message to mental health providers regarding the duties owed to their own clients or patients.[4] As a result, Bonita's state law claims for wrongful death, negligence, and malpractice may proceed, as Solutions is not entitled to immunity pursuant to R.C. 2305.51.

{¶ 29} As discussed, the duties owed by a mental health professional or mental health organization to third parties has been developed over several decades before codification in the Revised Code. In conjunction with the development of the "special relation" duty, when reading R.C. 2305.51 in its entirety and interpreting the plain language, it is clear that the General Assembly did not intend to extend immunity to cases of self-harm by patients. When read in context, the statute refers clearly to harm inflicted on third parties by the mental health patient. For example, with respect to reporting to law enforcement, the mental health professional or organization is required to identify two separately listed individuals: (1) the singular person making the threat, and (2) the potential victim or victims of that threat, differentiating the victim and the client or patient. *See* R.C. 2305.51 (B)(4).[5]

---

4. For example, Solutions' reading of R.C. 2305.51 could have unintended consequences in cases of medical malpractice where a patient dies by suicide. *See, e.g., Stewart v. Vivian*, 12th Dist. Clermont No. CA2015-05-039, 2016-Ohio-2892 (medical malpractice and wrongful death claims following former patient's suicide). To establish a claim of medical malpractice, a plaintiff must prove by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician of ordinary skill, care, and diligence would not have done under like or similar conditions, or was caused by the failure or omission to do some particular thing or things that such a physician would have done under like or similar conditions, and that the injury complained of was the direct and proximate result of the physician's doing or failing to do such particular thing or things. *Id.* at ¶ 93. If Solutions' theory was adopted, mental health professionals and mental health organizations could claim immunity from liability under R.C.2305.51 for even gross abuses of malpractice if the provider simply reported its suicidal client or patient to authorities consistent with R.C. 2305.51(B)(4), irrespective of the relevant standard of care.

5. Likewise, R.C. 2305.51(A)(1)(f) specifically requires that a "knowledgeable person" be someone who is "either an immediate family member of the client or patient or an individual who otherwise personally knows the client or patient." However, the statute makes no similar reference to the "potential victim or victims," who only need to be "clearly identifiable."

In that same section, "if feasible," the professional or organization should communicate to the victim or the victim's parent or guardian: (a) the nature of the threat, (b) the identity of the mental health client or patient making the threat, and (c) the identity of each potential victim of the threat – separately identifying the "client or patient" and the "potential victim." Furthermore, in R.C. 2305.51(C)(3), the mental health professional or organization is not required to take an action that would "increase the danger to a potential victim or increase the danger to the mental health client or patient," once again distinguishing the two. As correctly found by the trial court, this deliberate, repeated, and disjunctive use of the phrase constitutes strong legislative intent that the "victim" and "client or patient" are different individuals. Thus, contrary to Solutions argument otherwise, we find that the plain language of R.C. 2305.51 does not provide absolute immunity to them in this circumstance.

{¶ 30} This decision is consistent with the lengthy history in Ohio concerning the exception to the general rule where there is no duty to control the conduct of another to prevent that person from causing harm to another, absent an exception such as the "special relation" recognized by the supreme court in *Littleton*. While we note that Solutions is correct that R.C. 2305.51 was enacted in response to the supreme court's decision in *Estate of Morgan*, it fails to note that the statute specifically sought only to supersede the second, third, and fourth syllabus paragraph holdings. 1999 Ohio H.B. 71, Section 3. The General Assembly did not seek to supersede the first paragraph of the syllabus, which reflects the duty owed to third parties owed due to a "special relation." If the General Assembly had intended to confer immunity upon mental health professionals or organizations in cases involving self-harm, it could have easily done so by including it in the statute. That omission, in conjunction with the plain language of the statute and the legislative history, leads to one logical conclusion: the General Assembly intended to limit immunity to cases in which third parties are injured.

{¶ 31} As a result, we agree with the trial court that R.C. 2305.51 does not apply in this specific context and they are not afforded immunity on that basis.[6] In making this determination, we take no position on the merits of Bonita's claims. We merely find that Solutions' motion to dismiss based on application of R.C. 2305.51 was properly denied. Solutions' sole assignment of error is therefore without merit and is hereby overruled.

{¶ 32} Judgment affirmed.

S. POWELL, J., concurs.

PIPER, P.J., dissents

**PIPER, P.J., dissenting**

{¶ 33} I dissent from the opinion of my colleagues because if the legislature wanted to give immunity to mental health providers *only* when a patient or client caused serious injury or death *to another person*, it could have expressly included such wording in R.C.

---

6. {¶a} The dissent suggests this court's interpretation creates an illogical and absurd result, positing two hypotheticals where a deranged person under the care of a mental health provider could shoot and kill a police officer or a number of children, die by suicide, and then potentially enjoy a financial windfall, while leaving the murder victims without any redress. This is simply not the case.

{¶b} Take the first hypothetical where a deranged person under the care of a mental health provider murders a police officer and then commits suicide. Consistent with R.C. 2305.51, if the "suicide victim"/murderer or a "knowledgeable person" communicated an explicit threat on the life of the police officer to the mental health provider, the provider would be liable to the police officer's estate if it failed to act in accordance with R.C. 2305.51(B)(1)-(4). We agree, however, that the mental health provider would not be immune from a claim made by the "suicide victim"/murderer because R.C. 2305.51, as in this case, simply does not apply. Theoretically, the "suicide victim"/murderer could attempt a medical malpractice action against the mental health provider, provided the facts and circumstances of the case, but those claims would need to be proven by the preponderance of the evidence. *See, e.g., Stewart*, 2016-Ohio-2892 (medical malpractice and wrongful death claims following former patient's suicide).

{¶c} In the second hypothetical, the dissent presents a scenario where a delusional person, under the care of a mental health provider, enters a school, kills a number of children, then dies by suicide. The dissent claims that the mental health provider could assert immunity against the estates of the children, but not against the estate of the murdering decedent. Again, as in the hypothetical above, the children's estates would have a claim against the mental health provider if the provider received an explicit threat on the children's lives, as defined in R.C. 2305.51, and the provider failed to act in accordance with R.C. 2305.51(B)(1)(4). Likewise, the "suicide victim"/murderer could assert a theoretical claim for medical malpractice against his provider and not be barred by application of this statute. For that matter, the victims in both hypotheticals would have potential claims against their murderer. These are not absurd or illogical results.

2305.51(B). However, it chose not to. My colleagues accept Stewart's twisted reconstruction of the statute declaring that a patient or client cannot be a victim of their own mental illness. The statute as written disagrees. "We do not have the authority to dig deeper than the plain meaning of an unambiguous statute under the guise of either statutory interpretation or the liberal construction." *State ex rel. Clay v. Cuyahoga County Med. Examiner's Office*, 152 Ohio St.3d 163, 166, 2017-Ohio-8714, ¶ 15.

**Immunity for Mental Health Providers**

{¶ 34} The detection of mental health illness involves few absolutes and little certainty. The line is not distinct between anti-social behavior or poor judgment and mental illness involving derangement, distorted thinking, or aberrant behavior. Emotional disorders and psychological issues are frequently masked making them undetectable. The client or patient disassociated from reality often deceives themselves as well as those attempting to help them. Mental health professionals are not confined within an exact science, as obscure illnesses of the mind involve infinite complexity.[7]

{¶ 35} Thus, it naturally follows that the general assembly enacted R.C. 2305.51(B), granting mental health providers immunity from civil suit unless specific and enumerated circumstances create an exception to the general grant of immunity. Only if those statutorily-specific circumstances exist will immunity become unavailable to protect such professionals from civil liability. Appellate review must be restrained from enacting policy and impeding legislative intent when a statute is unambiguous.

**Plain and Ordinary Meaning**

---

7. "The undisputed facts of this case indicate that everyone tried to provide Justin with mental health treatment, except Justin himself. Mental illness can be exceedingly difficult to treat effectively because the diagnosis and treatment of such illnesses rely in least in part on the cooperation and participation of the very person who is mentally ill and may not fully understand the issues that others identify." *Stewart v. Warren Cty. Bd. of Commrs.*, S.D.Ohio No. 1:17-cv-84, 2019 U.S. Dist. LEXIS 150488, * 26 (Sep. 4, 2019), affirmed by *Stewart v. Warren Cty. Bd. of Commrs.*, 821 F.App'x 564, 566 (6th Cir. 2020)

{¶ 36} The intent to give a general immunity is undisputable because a client or patient can also become a victim. Chapter 2305 is titled Jurisdiction; Limitation of Actions. R.C. 2305.51 is specifically captioned Immunity of Mental Health Professional or Organization as to Violent Behavior by Client or Patient. A patient exercising an act of self-harm to the point of death is an act of violent behavior. R.C. 2305.51(B) is clear and unambiguous. "Violence" means "the use of physical force as to injure, abuse, damage, or destroy" and "suicide" involves "a deliberate act resulting in the death of the person who does it." *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary (accessed July 28, 2021). Suicide, being the destruction of life, is violent behavior. There is nothing in the statute that says the violent behavior must be intended for "another." The focus of the statute is on the violent *behavior* resulting from mental illness, not the *recipient* of the behavior.

{¶ 37} Similar to many statutes granting immunity, R.C. 2305.51(B) allows for specific circumstances that lift the grant of immunity by including that immunity is unavailable "only if" the explicit threat of inflicting imminent and serious physical harm has been communicated to the professional and if the professional has reason to believe that the person has the intent and ability to carry out the threat but fails to take certain steps to protect against the threats in a timely manner.

{¶ 38} Thus, in order to impose civil liability and avoid the application of immunity, the mental health provider must have received information of an express threat of the realistic possibility of serious physical harm or death, with an identifiable person being the subject of the threat, and the mental health provider must have reason to believe the intent and the ability to carry out the threat actually exists. The mental health provider then must fail to timely take appropriate action. R.C. 2305.51(B)(1) thru (4)(a) thru (c).

{¶ 39} Despite the majority's acceptance of Stewart's misguided interpretation,

nothing in the wording of the statute excludes the patient or client from reporting the intent of self-harm or otherwise being the victim. Nothing in the statute excludes a "knowledgeable person" from reporting to a mental health provider that a patient or client has a serious intention of hurting themselves. Nothing in the statute says the threat of harm must be to someone *other than* the patient or client. Instead, it is the imminent and real risk of violent behavior that formulates a duty and necessitates a mental health provider's response.

{¶ 40} We are victims of our own frailties. Self-destruction and self-harm are violent behaviors inflicted upon ourselves. The reality of some disorders is that they allow us to self-victimize. Stewart's proposed interpretation rests upon the premise that a patient or client cannot be a victim of his or her own mental illness. In crafting such a version of the statute, Stewart points to R.C. 2305.51(B)(4) which uses the word "victim" as applicable to third parties – persons other than the patient or client or mental health professional. It is a given that a "victim" could be a third party (when other than a client or patient, or mental health professional). However, this subsection does not eliminate in other scenarios that a "victim" can also be clients or patients themselves. Unlike Stewart's proposition, the statute does not limit the word "victim" to only one context or usage.

{¶ 41} While Stewart asserts the injury caused to a victim must always be from another person, we must apply its ordinary and plain meaning. "Victim" is defined as one who is "injured, destroyed, or sacrificed under various conditions." *Merriam-Webster Online*, http://www.merriam-webster.com/dictionary (accessed July 28, 2021). Thus, a suicide victim is a victim of his or her own demise. Due to the possibility of mental illness causing self-victimization, the definition of "victim" does not require another person.

{¶ 42} R.C. 2305.51(B)(4) is only one of several subsections articulating the response necessary, depending on the scenario, that a mental health provider must make

after receiving communications of an imminent threat of serious physical harm or death. The fact that subsection (B)(4) addresses action to be taken when the victim is a third party does not mean that a victim in other scenarios cannot be the patient or client. It is misguided and myopic to insist that the word "victim" can only be used in one context. Such a restrictive and obstinate application of the word denies its plain and ordinary meaning because any person can be a victim. Subsection (B)(4) is limited to a specific scenario and does not alter the overall ordinary meaning of "victim" as any person.

{¶ 43} Should the legislature's intent not be clear by the words used in the statute, we need only to look to the legislature's words in crafting the legislation.

### Intent Behind the Words as Written

{¶ 44} In promulgating the statute at issue, the legislature responded to *Estate of Morgan v. Fairfield Family Counseling Ctr.,* 77 Ohio St.3d 284 (1997). The legislature clearly believed a mental health provider should not be held responsible for a patient's violent behavior unless specific circumstances occurred. The general assembly's enactment represented an intention "to respectfully disagree with and supersede" the Ohio Supreme Court's holding that a mental health provider had a duty to protect against, and control, a patient's violent behavior. The *recipient* was not the focus of the legislation, rather, it was the creation of a burdensome and problematic duty.

{¶ 45} The duty announced in *Estate of Morgan* did not predicate itself on *who* was the recipient of violent behavior. In other words, the duty the general assembly sought to supersede included patients' conduct aimed at themselves as well as others. A suggestion that the general assembly's intention was aimed *only* at violent behavior upon *third parties* is skewed. The plain and ordinary usage of words as found in the statute does not require an in-depth analysis of *Estate of Morgan*, as the majority attempts.

### Unreasonable or Absurd Result

- 19 -

{¶ 46} Stewart's interpretation of R.C. 2305.51(B) creates an illogical and absurd result the general assembly would not have intended. For example, a deranged person under the care of a mental health provider could shoot and kill a police officer and then commit suicide. According to Stewart, the police officer's estate could be denied redress due to immunity, while the estate of the suicide victim who murdered the police officer could seek financial damages from the mental health provider. Similarly, a delusional person under the care of the mental health care provider may enter a school killing numerous children and then commit suicide. The person's mental health provider could assert immunity as against the estates of the children, but not against the estate of the murdering decedent.

{¶ 47} Statutes must be construed to avoid, not create, unreasonable, or absurd results. *State ex rel. Clay v. Cuyahoga County Med. Examiner's Office*, 152 Ohio St.3d 163, 168, 2017-Ohio-8714, ¶ 24. Contorting the statute so that it permits the estate of the person committing violent behavior to benefit financially, while the estate of an innocent person may not, offends public policy.

{¶ 48} In footnote 6, the asymmetrical, preferential consequences of Stewart's interpretation are acknowledged in the majority opinion. Yet, my colleagues do not find such consequences to be unreasonable or absurd because while the estate of the police officer or the estates of the children are denied the opportunity to seek liability from the mental health care provider, those estates can seek liability from the estate of the murderer/suicide victim (if he or she has one). This unreasonable or absurd result is lost on my colleagues that the murderer/suicide victim is granted a source of relief and potential financial recovery where the victims of the actual murderer are denied the same source of potential recovery. The majority's reasoning finds this acceptable since "the victims in both hypotheticals" can always make claims against their murderer/suicide victim. Such an

interpretation of the statute is to be avoided. In my opinion, there is simply nothing to support such a legislative intent which could have been easily expressed if intended.

**Motion to Dismiss**

{¶ 49} A motion requesting dismissal pursuant to Civ. R. 12(B)(6) tests the sufficiency of the complaint. *Lawson v. Mahoning Cty. Mental Health Bd.*, 7th Dist. Mahoning No. 10 MA 24, 2010-Ohio-6388. This requires independent appellate review of the complaint to ascertain whether allegations of statutory circumstances exist to lift the blanket of immunity. *Doolittle v. Shook*, 7th Dist. Mahoning County No. 06 MA 65, 2007-Ohio-1412 (the complaint did not allege statutory exceptions to the application of immunity and dismissal was appropriate); *Maternal Grandmother v. Hamilton County*, 1st Dist. Hamilton No. C-180662, 2020-Ohio-1580 (factual allegations are required to survive the assertion of immunity).

{¶ 50} As with most statutes where immunity is possible, the disagreement usually lies in whether the statutory exceptions strip the general grant of immunity.[8] Here, however, Stewart does not assert that enumerated circumstances exist prohibiting immunity, but rather, that the statute itself does not apply to certain people. Yet, the statute does not exclude a patient or a client from also being considered as the victim of violent behavior. The statute clearly codifies immunity to mental health providers in what would have previously been a common law negligence action. Civil liability only remains a possibility, and immunity averted, when circumstances articulated in the statute exist. Due to the complexities of mental health, the statute makes it clear that it is not what the mental health professional *should have* had communicated, but rather, what *was* communicated.

---

8. For example, multiple statutes within the Ohio Revised Code grant immunity unless circumstances prohibit its application. *See* R.C. 2744.03 (defenses or immunities of subdivision and employees); R.C. 2151.421(H)(1)(b) (immunity for providers associated with reporting child abuse and follow up procedures).

{¶ 51} Stewart's complaint extensively lays out factual circumstances as to why some persons, other than the named defendants herein, may have had reason to suspect Justin's mental health issues and the possible risk of suicide. However, the complaint never alleges that any of this information *was* communicated to any of the defendants as required by the statute. The complaint sufficiently avers that, in hindsight, Justin may have foreseeably been a victim of self-harm, or even self-destruction, but the complaint is absent any allegation that the mental health providers named as defendants had this information communicated to them. Nor does the complaint or Stewart's response to the defendant's motion to dismiss assert the existence of statutory circumstances that lift the veil of immunity.[9]

{¶ 52} Despite the defendants' status as mental health providers as defined in R.C. 2305.51, the complaint, motion to dismiss, and Stewart's response do not allege the statutory circumstances necessary to avoid the application of immunity. Specifically, Stewart does not allege any imminent threat of self-harm or suicide was communicated to any of the defendants.

## Conclusion

{¶ 53} While Stewart's constructed interpretation of the statute is unique and creative, it cannot avoid the plain and ordinary reading of the statute. As a parent, I experience immense compassion for Justin and his family. Yet, plain and ordinary meaning must be attributed to the words within R.C. 2305.51(B), unswayed no matter the tragedy or depth of sympathy. Since the statute is applicable to defendants and Stewart failed to make any argument as to why immunity is not to be applied, the motion to dismiss should have

---

9. "While Justin's mental health records indicate concerns about his treatment of others, at no time did any of these mental health providers * * * or even loving family members believe Justin was in danger of hurting himself. Prior to his suicide, Justin had not engaged in self-harm and had repeatedly denied contemplating suicide." *Stewart v. Warren Cty. Bd. of Commrs.*, S.D.Ohio No. 1:17-cv-84, 2019 U.S. Dist. LEXIS 150488, * 27 (Sep. 4, 2019), affirmed by *Stewart v. Warren Cty. Bd. of Commrs.*, 821 F.Appx. 564, 566 (6th Cir. 2020)

been granted.  Therefore, I respectfully dissent from the majority opinion.